WILLIAM T. BARCLAY·

*v.*

CHARLES ROOME PARMELE COMPANY.

[Decided August 22d, 1905.]

Defendant's assignor agreed with complainant to manufacture and sell proprietary medicines suggested by complainant, who conveyed to defendant's assignor and a firm formed by him all his right and title to certain formulæ, and granted the exclusive use of his name as a trade mark, in consideration of an agreed royalty on sales. The contract was subsequently modified as between complainant and defendant, by which defendant agreed to pay a royalty on all sales of the preparations "suggested" by complainant and bearing his name, but the contract contained no covenant for forfeiture on non-payment of such royalties.—*Held,* that complainant is entitled to royalties on all the preparations which were at the time of the modified contract or thereafter sold by defendant as complainant's preparations, even though he might not have invented or discovered the process for making them, but he is not entitled to rescind the contract for a mere failure to pay such royalties.

On bills, answers, replication, proofs and stipulations.

*Mr. James E. Howell* and *Mr. Henry W. Goodrich* (of the New York bar), for the complainant.

*Mr. Gilbert Collins* and *Mr. Joseph J. Baker* and *Mr. Arthur W. Michell* (of the New York bar), for the defendant.

EMERY, V. C.

Two causes, between the same parties as complainant and defendant, are heard together. The first is a suit brought by Dr. Barclay, the complainant, to recover royalties upon the sale of proprietary medicines or compounds, claimed to be due from the defendant company upon sales made by it under written contracts, one of which was dated October 23d, 1893, and made between complainant and one E. M. Johnson, the assignor

of the Parmele company, and the other a supplemental contract, dated September 8th, 1894, made directly between complainant and defendant, modifying the former contract. Complainant received royalties from the defendant from October, 1893, up to about September, 1900, and the first bill, filed March 9th, 1903, is brought for an account of the sales made and royalties due up to February 10th, 1903. On this date the complainant served notice on the defendant of its rescission and abrogation of the contracts, by reason of the defendant's failure to pay royalties or to perform its part of the contract.

The complainant asks that an account be taken, as well for the period during which the royalties were paid as for the subsequent period, upon the ground that the accounts rendered were incorrect and willfully misrepresented and understated the amount, of the sales upon which royalties were due to complainant. No proof to substantiate this claim has, however, been offered.

The object of the second bill (filed April 23d, 1903) is to have the contracts declared void and abrogated because of defendant's renunciation of them by its refusal to pay royalties, and other acts set out in the bill, which were accepted by complainant as an abrogation of the contract, declared by its notice of February 10th, 1903. And as further relief following the rescission or abrogation of the contracts, complainant seeks by this second bill an account of profits since February 10th, 1903, a confirmation of complainant's title to the trade marks under which the compounds have been sold, and injunctions against using or disposing of the trade marks or disclosing the secret process under which the compounds are made. The general defence applicable to both suits is that the defendant never at any time manufactured the preparations under the formulæ or processes furnished by complainant, and that the formulæ under which it has always manufactured were not the invention or discovery of the complainant, but of one Hays, or Haas, and of its own chemists; and that it has made no sales of any preparations the process of which was discovered or invented by complainant. It admits payment of royalties to complainant on sales of preparations made by it, and marketed under complain-

ant's name as preparations of Dr. Barclay, up to August, 1900, but says that these payments were made by mistake, under the belief that complainant invented the process for the preparations, and under false representations made by complainant, and under a mistake as to its rights. In its answer to the first bill, defendant denies the right to any account and asks that the contracts may be declared void. In the answer to the second bill, while admitting failure to pay any royalties after August, 1900, under advice of counsel, it denies any renunciation or abrogation of the contracts on its part, or that the complainant had any right to abrogate the contract by the notice of February 10th, 1903, and at the hearing resists the rescission of the contract. It claims the exclusive right to the trade marks under which the several compounds have been sold, all of which, except one (Calcauro) have been copyrighted in its name, and denies any right to account or compensation, either before or since February 10th, 1903, upon the general ground that the compounds it has sold and is selling are not manufactured under any process or formula discovered or invented by complainant.

The first question for decision relates to the construction of the written contracts between these parties, and this is whether, under the facts proved in the case bearing upon the construction and application of the contracts, this defence, that the preparations have not been manufactured under any process discovered or invented by complainant, is an answer to the claim for royalties under these contracts, and especially to the claim for royalties under the contract of September 8th, 1894, modifying the original contract. For the decision of this question and the application of its terms to the subject-matter, it will be necessary to consider not only the terms or words of the contracts themselves, but also the circumstances under which they were made and the subsequent action of the parties under them. The first contract made between complainant and Johnson (October 23d, 1893) opened with the recital

"that whereas, said Barclay has discovered a new and valuable combination of gold and arsenic, also other combinations of gold with various metallic salts, and has invented a process for making the first-named of

these preparations, and is desirous of securing the aid of a competent party to introduce the above to the medical profession and market the same through the world,"

and Barclay on his part then agreed (first section) to assign and did thereby assign and set over to Johnson

"all right, title, interest, claim and property of whatsoever nature that said Barclay now has or is now possessed of, or may hereafter acquire in said preparations of gold, including such letters-patent as said Barclay may obtain from the government of the United States, or from any other government, granting to him the exclusive right to manufacture and vend said preparation or preparations within the territory covered by said letters-patent, to have and to hold the same for himself, his heirs, executors, administrators and assigns, during the life of this agreement" [fifty years].

*Second.* By the fifth section

"said Barclay agrees that during the existence of this agreement, his name may be attached by said Johnson or his assigns to the labels used on said preparations, and he hereby conveys to said Johnson the exclusive right to use his name as a trade mark in connection with the said preparations, or any other preparations of gold for medicinal uses that said Barclay may devise, and said Barclay hereby agrees, both for himself and his heirs, executors, administrators and assigns, that during the life of this agreement he will not engage, either directly or indirectly, in the manufacture or sale of any preparation of gold for medicinal use."

It was also agreed (eighth section) that after the execution of the agreement, all orders for said preparation and all correspondence relating thereto should be referred by said Barclay to said Johnson or his assigns.

Barclay also agreed (sixth section) to use diligence in applying for patents for combinations of gold with manganese and other salts desirable for medicinal use.

As "conditions" under which the agreement and assignment of Dr. Barclay's rights was made in section one of the contract, Johnson on his part agreed (1) (second section) to organize a firm or corporation with the benefit of Johnson & Johnson's name and connections, and with sufficient capital for the purpose of marketing said preparations, within three months from date; (2) "to pay to Barclay as royalty the sum of ten cents

per ounce for each ounce of said preparations sold in one-ounce bottles," with a reduction of the royalty in proportion "in case said preparations are sold in bottles containing more than one ounce at prices less than charged for the ounce size." (3) (fourth section) On the last day of each month to furnish Barclay with a statement "showing the amount of said preparations sold during the previous month by said Johnson or assigns," and to pay during the month the amount of the royalties shown by the statement. No royalties were to be paid to Barclay on any of said preparations distributed gratis among the physicians or druggists as samples for advertising purposes. The agreement contained the following provision for cancellation by Johnson, but contained no express provision for cancellation by Barclay:

"9th. It is further agreed between the parties hereto that said Johnson or assigns may at any time cancel this agreement and all covenants hereunder by notice to said Barclay, in writing, of such intention to do so, if it shall appear that such preparations are possessed of materially less therapeutic value than claimed for them, or if they possess qualities that render their use so dangerous to life as to prevent their employment by physicians, and in case of such cancellation, all rights, interest or property herein granted to said Johnson shall revert to said Barclay, who shall thenceforth enjoy them the same as though this agreement had never existed."

The agreement (section 10) was to continue for fifty years, unless sooner canceled, in accordance with paragraph 9, and (section 11) was to be binding upon the heirs, executors, administrators and assigns of the parties.

The modification of September 8th, 1894, made between complainant and the defendant company, under its seal and the signature of its president, Mr. Parmele, recites that it is supplemental to the agreement of October 23d, 1893, which was assigned by Johnson to the E. M. Johnson Company, now known as the Parmele Company, and then agrees

"that paragraph three of the contract of the 23d of October, 1893, relating to the amount of royalties to be paid said Barclay by said Johnson or assigns, shall be and hereby is canceled, and it is hereby agreed between the parties that said Barclay shall receive, in lieu of the royalties due him under said paragraph and contract, each month, as royalty, the

sum equal to seven and one-half per cent. of the net sales of the gold preparations suggested by said Barclay, and bearing his name, made during said month by said C. R. Parmele Co.,"

the company also having the right to make such price per ounce for the preparations. The difference in the words of the two contracts describing the preparations on which royalty is to be paid is vital, for one of the principal disputes arising upon the evidence as to the discovery of the process is whether Dr. Barclay not only originally suggested the idea of the compound to Hays, but also directed or instructed Hays as to the process, or whether Hays himself originated both the idea and the process. Soon after the making of the original contract, Hays, with Barclay's consent, was employed by Johnson to make the preparations of gold with arsenic and other metallic salts, which were put on the market as the "Barclay preparations," and under the trade mark names suggested by Johnson and consented to by Barclay. These were "Arsenauro" for gold and arsenic, "Manganauro" for gold and manganese, "Mercauro," gold and mercury, and "Calcauro," gold and calcium. Dr. Barclay was not himself a chemist, and shortly after the execution of the original contract questions or doubts had arisen whether the process or formula for making the gold and arsenic preparations, given to Johnson by Barclay at the time of executing the original contract, was correct or efficacious, and also whether Dr. Barclay, even though he might have suggested the original preparation of gold and arsenic, was able to give the chemical process by which it could be satisfactorily made, and whether anyone except Hays could make them. Johnson's first contract of employment with Hays, which was in writing and dated November 21st, 1893, contained, among other things, an assignment by Hays of all information, formulæ or interest Hays had "in the Barclay preparations," and a provision for a certain royalty to Hays "from the sale of the Barclay preparations," and at the time of the execution of the modified contract the defendant company had also an assignment of Hays' right to the compound first suggested, that of gold and arsenic, then and afterwards marketed, under the trade name "Arsenauro," as one of the Barclay

preparations. Hays was also, at the time of the modified contract, still in the employ of the defendant, manufacturing all of the preparations for sale by defendant and put on the market as the Barclay preparations.

These circumstances, in connection with the other evidence in the case, show that the first question to be settled is the true construction and application of the words used in the contract of 1894, agreeing to pay royalty on the sales "of the gold preparations suggested by said Barclay and bearing his name," and whether, under the modified contract, the complainant is not still entitled to royalties on all the preparations which were then or afterwards put on the market by the defendant as the Barclay preparations, even though he might not have invented or discovered the process for making the preparations.

I am inclined to think that the words of the contract of 1894 themselves have that construction, and when the application of the descriptive words used in this contract is made to the subject-matter, in connection with the situation of the parties at the time it was made, and their conduct up to that time, confirmed by their subsequent action under the modified contract, I think there can be no reasonable doubt that one of the purposes of this modification of the contract was to secure to Dr. Barclay royalties on the sale of the preparations then sold under his name, notwithstanding the controversy which had previously arisen as to whether Dr. Barclay or Hays originated the process of making the preparations. The consideration given by Dr. Barclay for the modification was a reduction in the royalty paid to him under the original contract, which was probably greater than the amount of royalty the defendant company had agreed to pay Hays, which included only one preparation.

Upon the evidence, I conclude that under the contract of September, 1894, the preparations upon which royalties were to be paid were the gold preparations, then or afterwards bearing Barclay's name, and that all of these preparations then so sold were, within the meaning of this contract between these parties, preparations "suggested by Barclay." The evidence bearing upon the execution and application of the original and modified contracts, and the action of the parties under them,

both oral and documentary, is very voluminous, and I shall not here review it in detail, but will file with this opinion a summary of the evidence for the information and use of the parties. "Suggestion" of a compound or preparation is an entirely different thing from such an origination or discovery of a process for making the compound as would entitle the discoverer to letters-patent for the process. Neither Johnson nor Hays was able to procure letters-patent on the processes for making the preparations which they disclosed in their applications (one of Johnson and four of Hays), and neither of them, so far as appears from the evidence, was ever entitled to a patent for their discoveries. The evidence also shows that from September, 1894, at least, any applications for patents were abandoned by the mutual consent of the parties, and that the "trade marks," including Barclay's name, were relied on as their sole protection. In this case, therefore, we are not deciding conflicting claims for an invention for which there are letters-patent, but are construing a business contract made and acted on for the primary purpose of marketing under Barclay's name, if desired, certain defined proprietary medicines, which might or might not be patented, and the question is, what was the description of the medicines which were to be sold adopted by the parties, and to what medicines is the description applicable? That Dr. Barclay originally suggested the preparations to Johnson, under whom defendant claims, seems clear, and that he also suggested the first preparation of gold and arsenic to Hays himself, in the presence of Mr. Hieber, the employer of Hays, is also satisfactorily established by the evidence of both Barclay and Hieber. Hays denies this, but his credibility is altogether destroyed, not only by his conviction for larceny and burglary, and his general bad reputation, but also by his conduct in accepting employment at once under Johnson, for the purpose of preparing the compounds to be marketed as the Barclay preparations, and continuing this for years. I conclude that all of the preparations which at the time of the modified contract were then sold under Dr. Barclay's name were preparations suggested by Dr. Barclay, with the possible exception of the preparation called "Calcauro," as to which special reference will hereafter

15

be made. And in reference to the construction of the contract, I conclude, further, that under it royalties are to be paid on the preparations then or subsequently bearing the name of Barclay, even if the use of the name was afterwards discontinued. The words of the contract referring to the preparations are descriptive only of their *character;* they are not words describing the conditions of the continuance of payment of royalties. They cannot therefore be construed as if the contract provided for payment of royalty on preparations "suggested by said Barclay *so long as* [or while] they bear his name." The exclusive right to use Barclay's name as a trade mark on the preparations was secured to defendant company by the original agreement, and the name was so used up to August, 1900, or shortly prior thereto, and, as the evidence shows, this was a most valuable right, for the purpose of introducing the remedies to the profession and the public. For the purposes of applying this contract of 1894, the name "Barclay" on the preparations therefore becomes descriptive of the subject-matter of the royalties, and on all preparations which are substantially the same as those then or subsequently sold under the name of "Barclay," the complainant, in my judgment, is entitled to royalties, notwithstanding the name of Barclay, as part of the trade mark, was discontinued. There is no claim on the part of the defendant that the preparations made after August, 1900, differ substantially or otherwise from the preparations previously made by it, which bore Dr. Barclay's name. The precise formula or process under which defendant manufactures has not been proved, as the defendant declines to disclose it, and rests its whole case, so far as the question of identity of preparations is concerned, upon expert evidence and chemical tests showing that the solutions prepared by Dr. Barclay are not and cannot be chemically the same as those which have been made by defendant company from the time of its original manufacture. The principal practical chemical test employed was one called the ferrous-sulphate test. This substance, when applied to the genuine solutions prepared by defendant, results in an immediate or almost immediate deposit of the gold as a precipitate, while the liquid becomes clear. In the alleged spurious compounds, the result is

a liquid more or less clouded or opaque, with little or no precipitation. This practical test was referred to by Johnson in a letter to Barclay as early as December 21st, 1893 (*Exhibit C 42*), while Hays was making the preparations. Parmele says this test has been applied to every single batch of goods made since the company became the Parmele company (August, 1894). This test operates in the same way upon all of the preparations made by the defendant company since it put them on the market, as well before as after the contract of 1894, and before and after August, 1900, when the use of Barclay's name was discontinued. The conclusion, therefore, is justified that the defendant, since August, 1900, has continued to manufacture and sell, under the former trade mark names (with the exception of the use of Dr. Barclay's name), substantially the same preparations which up to that time had his name as part of their trade mark, and that they were therefore included in the contract for royalties of 1894, on preparations "suggested by Barclay and bearing his name." Mr. Parmele, it is true, stated, on cross-examination, that the method of manufacture at the time of the hearing and under Hays, who left in 1896, was different, but that he could not point out the differences in detail, and upon being directly asked as to what was their present process for making arsenauro, the question was objected to and overruled as not cross-examination. His mere general statement, therefore, that the method of manufacture is different, cannot overcome or affect the weight to be given to the practical test applied, as indicating that the preparations continued to be substantially the same as in 1894, and certainly the same as in August, 1900.

Some question has been raised as to whether the preparation called "Calcauro" was suggested by Dr. Barclay, or came within the contract. A letter from Johnson & Company to Barclay, dated December 20th, 1893, requests the latter to give instructions to a physician in relation to the use of "your preparations," *i. e.*, the particular sort of cases where "Manganauro," "Calcauro," "Arsenauro," &c., are used. In another letter to Barclay, dated December 30th, 1893, Johnson says the name of Barclay combined with Arsenauro, *Calcauro, &c.*, will be invin-

cible. But on February 16th, 1893, Johnson, in a letter of that date to Dr. Wood, says that although they have been paying Dr. Barclay royalty on "Calcauro," he (Barclay) did not devise the formula, which was suggested by a Dr. Wight, of Brooklyn, but as Dr. Wight made no claim, they had thought it best to include the remedy under the head of the Barclay preparations. The company continued to pay Dr. Barclay royalty on the sales of calcauro, as well after as before the contract of 1894, and up to August, 1900. The name Barclay, however, did not appear on the bottles of "Calcauro," and the principal evidence that this was included under the contract of 1894 as among the preparations "bearing his name" is the continuance of the statement of its sales and payment of royalties on it to Barclay, along with the other preparations, from 1894 to April, 1899. Mr. Parmele in 1900, when applying for another modification of the contract, again raises the question in a letter to Dr. Barclay, dated April 23d, 1900, where he asks Barclay to bear in mind that he (Barclay) was not the one who suggested the combinations "Calcauro" and "Manganauro." Subsequently, and apparently in settlement of this and other questions referred to in the letter, a deduction or allowance from the royalties was made, by consent of the parties, in June, 1900, by a letter from the defendant signed and written by Parmele to Barclay, dated June 26th, 1900, in which Parmele, "bringing their squabble to an end," recites the agreement as to deduction from the royalty, and encloses a statement of sales from May, 1899, to April, 1900, the first since the dispute commenced in May, 1899. This letter was formally "approved" by Dr. Barclay, at Parmele's request, making thus a third formal contract. This statement of sales apparently included all sales without distinction, and it is admitted by defendant that up to August, 1900, the sales of "Calcauro" were included, as well as those of "Arsenauro," "Mercauro" and "Manganauro," the three other preparations. Dr. Barclay claimed to have suggested the "Calcauro" compound of gold and calcium, and I think that, referring to the conduct of the parties in their dealings under the contract, as applying the words describing the preparation, royalty on the sales of "Calcauro" must also be included as a combination "suggested

·by Barclay." The defendant was not by either contract required to use Barclay's name as a trade mark, and the further
words of description, "and bearing his name," were not, in my
judgment, meant to impose an additional limitation upon the
right to royalties on compounds suggested by Barclay, but "and"
in this respect should be construed as meaning "or." The further contention of defendant's counsel, that there was a total
failure of consideration for the contracts, if there was in fact
no invention or discovery by Dr. Barclay, as recited in the
original agreement, ignores the important fact that other matters entered into the consideration, and that as to these there
was no failure. These were the use of Dr. Barclay's name as a
trade mark, his agreement to give them the benefit of future
discoveries, and his agreement not to engage in the manufacture
or sale of gold preparations. His services and those of Dr.
Wood, as physicians, in introducing and recommending the Barclay preparations to the profession and the public, and in advising as to their use, were also contemplated, as appears by the
Wood contract and the voluminous correspondence, and this
service and advice were at all times rendered. The case, therefore, does not come within the application of the rules relating
to relief from the payment of any of the purchase price where
there is a total failure of consideration.

The claim of the complainant under his second bill to rescind
the contracts for non-payment of royalties and the breach of
other covenants by the defendant, and other· relief incident to
the rescission, is not well founded. Complainant, by the original
contract, conveyed absolutely his interest in the invention or
discovery for a term of fifty years, and also granted the exclusive
use of his name as a trade mark in connection with the preparations for the same time. Johnson became, by these assignments,
not a mere licensee of rights, as to which complainant still retained a legal interest or estate, but an assignee vested with
complainant's entire estate and interest in the subject-matter
granted, both legal and equitable.

In consideration of these grants and of certain covenants of
Barclay, Johnson, the purchaser, agreed to pay as the consideration for them a royalty on the articles sold. This was, in effect,

an agreement to pay the purchase price at a future time and a sum to be determined by the number of articles. In the absence of any express provision in the conveyance itself for forfeiture of the estate granted on non-payment or other breach, the rights or interests in property actually conveyed cannot be revested in the grantor by a mere breach of the covenants by the grantee, and the only remedy is upon the covenants. There was in this case no such express conveyance upon condition or provision for forfeiture or revesting in Barclay the rights granted on default of the grantee. The words of the first section, declaring the assignment of Barclay's interest to be "under the following conditions," and which preceded a series of agreements by each party to the agreement, was not meant to create an estate terminable on the breach on Johnson's part of either one of several conditions subsequent and to revest the estate in the grantor, but the word "conditions" was used as equivalent to "covenant" or "agreement," and must be so construed. Under a license providing for the payment of royalties as the sole consideration for the right to use a patent, the licensor may, perhaps, at his option, revoke the license for a failure to pay the royalties, followed by a repudiation of the license, and proceed against the licensee as an infringer upon a principle of forfeiture analogous to that applied between landlord and tenants on a repudiation of the tenancy, but a forfeiture of rights conveyed by an absolute assignment involves different considerations. Where the assignment expressly provides for forfeiture it may be enforced, but, as was said in a leading case, where there was such express clause in an assignment of a patent, the right of forfeiture is enforced upon conditions broken, and not upon the mere non-payment of the consideration for the assignment. *Littlefield* v. *Perry, 21 Wall. 205, 220 (1874)*. I have not been referred to, nor have I found in my examination of the case, any authority declaring a forfeiture in a case of this character.

As the relief asked in the second bill is based wholly on the right or claim of forfeiture, it must be dismissed.

The first bill prayed for an accounting only to the 10th of February, 1903, the date on which complainant claimed to have

rescinded the contract. On the settlement of the decree I will hear counsel as to whether, under the general prayer for relief, the account should, under the usual practice, be taken to date, and also whether it should include an account for sales previous to September, 1900, and from the beginning of the contract.