WILBURT C. DAVISON, DORIS DUKE, JAMES R. FELTS, JR., BENJAMIN F. FEW, PHILIP B. HEARTT, RICHARD B. HENNEY, AMOS R. KEARNS, ROBERT MCCORMACK, WILLIAM B. MCGUIRE, THOMAS L. PERKINS, MARSHALL I. PICKENS, R. GRADY RANKIN, MARY D. B. T. SEMANS, J. KELLY SISK, AND KENNETH C. TOWE, AS TRUSTEES OF THE DUKE ENDOWMENT, A TRUST ESTABLISHED BY JAMES B. DUKE BY INDENTURE DATED DECEMBER 11, 1924

— V. —

DUKE UNIVERSITY; THE TRUSTEES OF DAVIDSON COLLEGE; FURMAN UNIVERSITY; JOHNSON C. SMITH UNIVERSITY, INCORPORATED; CABARRUS MEMORIAL HOSPITAL AND THE GREENVILLE HOSPITAL SYSTEM BOARD OF TRUSTEES, INDIVIDUALLY AND AS REPRESENTATIVES OF THE CLASSES OF HOSPITALS SIMILARLY SITUATED; BAPTIST CHILDREN'S HOMES OF NORTH CAROLINA, INC., AND EPWORTH CHILDREN'S HOME, INDIVIDUALLY AND AS REPRESENTATIVES OF THE CLASSES OF CHILD-CARING INSTITUTIONS SIMILARLY SITUATED; CHARGE CONFERENCE OF MCMANNEN UNITED METHODIST CHURCH, AND CHARGE CONFERENCE OF HILL'S CHAPEL MEMORIAL UNITED METHODIST CHURCH, INDIVIDUALLY AND AS REPRESENTATIVES OF THE CLASSES OF RURAL CHURCHES SIMILARLY SITUATED; REV. EDGAR NEASE, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE CLASS OF SUPERANNUATED PREACHERS SIMILARLY SITUATED; MARY JANE WALTON, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE CLASS OF WIDOWS OF METHODIST MINISTERS SIMILARLY SITUATED; CHARLES LEE WALTON, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE CLASS OF ORPHANS OF METHODIST MINISTERS SIMILARLY SITUATED; HON. ROBERT MORGAN, ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA; HON. DANIEL R. MCLEOD, ATTORNEY GENERAL OF THE STATE OF SOUTH CAROLINA; NORTH CAROLINA HOSPITAL ASSOCIATION, INC.; SOUTH CAROLINA HOSPITAL ASSOCIATION; NORTH CAROLINA CHILD CARE ASSOCIATION; NORTH CAROLINA ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, SOUTHEASTERN JURISDICTION; WESTERN NORTH CAROLINA ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, SOUTHEASTERN JURISDICTION; DUKE POWER COMPANY; CALDWELL POWER COMPANY; CATAWBA MANUFACTURING AND ELECTRIC POWER CO.; CRESCENT LAND & TIMBER CORP.; EASTOVER LAND COMPANY; EASTOVER MINING COMPANY; GREENVILLE GAS AND ELECTRIC LIGHT AND POWER COMPANY; MILL-POWER SUPPLY COMPANY; SOUTHERN POWER COMPANY; WATEREE POWER COMPANY; AND WESTERN CAROLINA POWER COMPANY

No. 37

(Filed 14 March 1973)

1. Trusts § 4— judicial modification of trust

The courts will modify a trust instrument to preserve the purpose of the trust or protect its beneficiaries when some exigency or emergency not anticipated by the trustor will defeat his intent.

2. Trusts § 4— Duke Endowment — investments — distribution of principal — judicial modification

There was ample evidence to support findings by the trial court that the purposes and objects of the Duke Endowment have been

threatened by unanticipated changes of circumstances brought about by inflation and by provisions of the Tax Reform Act of 1969 which might require the Endowment to divest itself of all but 25% of the outstanding stock of Duke Power Company by 1979, and a provision of the Endowment indenture restricting investments by the trustees to investments in Duke Power Company and certain government bonds was properly modified by the trial court to allow the trustees to invest the trust funds in other securities and properties and to grant the trustees authority to distribute principal of the Endowment to the extent necessary to comply with the provisions of the Tax Reform Act of 1969.

**3. Trusts § 10— distribution of corpus — when permitted**

The general rule that the principal or corpus constituting the subject matter of a trust cannot be distributed prior to termination in the absence of express or implied authority in the trust instrument is subject to two exceptions: (1) a court may permit modification of the instrument when essential to protect the trust and its beneficiaries from an unforeseen exigency threatening to destroy the settlor's intent and purposes in creating the trust, and (2) a court may order invasion of the corpus for the necessary support of a beneficiary when the interest of another beneficiary is not thereby impaired.

**4. Trusts § 4— determination of intent of trustor**

The intent of a trustor will be determined by the language he chooses to convey his thoughts, the purposes he seeks to accomplish, and the situation of the other parties to or benefited by the trust.

**5. Trusts § 6— extent of trustee discretion**

Ordinarily, the extent of the discretion conferred upon trustees by a settlor depends upon the terms of the trust and the nature of the powers interpreted in the light of all the circumstances known to the settlor when he executed the trust instrument.

**6. Trusts § 4— interpretation of trust indenture — question of law**

The interpretation of a trust indenture is a question of law for the court which is subject to review by the appellate courts.

**7. Trusts § 4— Duke Endowment — discretion to withhold income — options for use of withheld income — additions to corpus — subsequent distribution prohibited**

In giving the trustees of the Duke Endowment the discretion to withhold income distributable to beneficiaries other than Duke University and either to (1) accumulate the withheld amounts for expenditure in future years, (2) add the withheld amounts to the trust corpus, (3) pay the withheld amounts to or for the benefit of another trust purpose, or (4) pay the withheld amounts to or for the benefit of any like charitable purpose or like charitable hospital, the trustor intended that the exercise of one option would exclude successive action under another option with respect to the same withheld funds; therefore, once the trustees added funds to the corpus under option (2), the withheld funds could not be recalled and used for another purpose pursuant to another option.

8. **Trusts § 4— Duke Endowment — additions of income to corpus — excise tax — absence of emergency permitting modification of trust**

The record does not show that a 4% excise tax provided by the Tax Reform Act of 1969 on approximately $115,000 of annual income derived from an accumulation of withheld distributable income which has been added to the corpus of the Duke Endowment would create such an exigency or emergency which might frustrate the intent and purposes of the trustor so as to permit judicial modification of the trust indenture to give the trustees authority to distribute such additions to corpus.

9. **Trusts § 4— Duke Endowment — distribution of principal — trustees' judgment**

The trial court did not err in determining that a distribution of principal of the Duke Endowment permitted by the court to the extent required by the Tax Reform Act of 1969 need not be made to the same beneficiaries, for the same purposes and in the same percentages of distribution provided in the trust indenture or in accordance with any other predetermined formula, but that such distribution should be made according to the trustees' judgment.

Chief Justice BOBBITT and Justice SHARP dissent in part and vote to affirm without modification.

APPEAL by plaintiffs, Trustees of the Duke Endowment, and defendant, The Attorney General of North Carolina, and defendants Mary Jane Walton and Bailey Patrick, Jr., Guardian ad Litem, from *Ervin, J.,* 10 January 1972 Special Session of MECKLENBURG Superior Court.

This case was docketed and argued as No. 11 at the Fall Term, 1972.

James B. Duke, on 11 December 1924, created a living trust known as the Duke Endowment. Mr. Duke, a resident of the State of New Jersey, on that date placed the following securities in the trust:

122,647 Shares of Stock of Duke Power Company, a corporation organized and existing under the laws of the State of New Jersey.

100,000 Ordinary Shares of the Stock of British-American Tobacco Company, Limited, a corporation organized and existing under the laws of Great Britain.

75,000 Shares of the Common "B" Stock of R. J. Reynolds Tobacco Company, a corporation organized and existing under the laws of said State of New Jersey.

5,000 Shares of the Common Stock of George W. Helme Company, a corporation organized and existing under the laws of said State of New Jersey.

12,325 Shares of the Stock of Republic Cotton Mills, a corporation organized and existing under the laws of the State of South Carolina.

7,935-3/10 Shares of the Common Stock of Judson Mills, a corporation organized and existing under the laws of said State of South Carolina.

The trust has perpetual existence and is governed by a self-perpetuating 15-member board. The Indenture creating the trust directed the Trustees to add 20% of the income from the trust created to the corpus of the trust until such additions aggregate $40 million. The remaining income from the trust was to be distributed as follows:

32% to Duke University

32% to North Carolina and South Carolina hospitals

5% to Davidson College

5% to Furman University

4% to Johnson C. Smith University

10% to North Carolina and South Carolina orphanages

2% to superannuated Methodist preachers and widows and orphans

6% to build Methodist Churches in North Carolina

4% to maintain Methodist Churches in North Carolina

Paragraph 6 of the Third Division of the Indenture permitted the Trustees to withhold income from beneficiaries (except Duke University) and granted them wide latitude and discretion in distributing income to charitable beneficiaries.

Pursuant to the authority of this section, the Trustees during the period 1934 through 1959 withheld income for the benefit of Duke University, Davidson College, Furman University and Johnson C. Smith University. Paragraph 6 of the Third Division of the Indenture and the resolutions withholding income thereunder will be fully quoted in the opinion.

The trustor's intent and purposes in creating the Duke Endowment are partially revealed in the Seventh Division of the Indenture.

"SEVENTH: 1. The party of the first part hereby declares for the guidance of the trustees hereunder:

2. For many years I have been engaged in the development of water powers in certain sections of the States of North Carolina and South Carolina. In my study of this subject I have observed how such utilization of a natural resource, which otherwise would run in waste to the sea and not remain and increase as a forest, both gives impetus to industrial life and provides a safe and enduring investment for capital. My ambition is that the revenues of such developments shall administer to the social welfare, as the operation of such developments is administering to the economic welfare, of the communities which they serve. With these views in mind I recommend the securities of the Southern Power System (the Duke Power Company and its subsidiary companies) as the prime investment for the funds of this trust; and I advise the trustees that they do not change any such investment except in response to the most urgent and extraordinary necessity; and I request the trustees to see to it that at all times these companies be managed and operated by the men best qualified for such a service."

After naming Duke University, hospitals, orphans, Methodist churches, Methodist ministers, and certain members of their families as beneficiaries of the Endowment, Mr. Duke stated:

"7. From the foregoing it will be seen that I have endeavored to make provision in some measure for the needs of mankind along physical, mental and spiritual lines, largely confining the benefactions to those sections served by these water power developments."

On the same date that he executed the Indenture creating the Duke Endowment, Mr. Duke also created the Doris Duke Trust. The Trustees named in the Duke Endowment Indenture were also appointed to manage the Doris Duke Trust. 2,000 shares of the common stock of Duke Power Company were transferred to this trust with the same investment restrictions placed on the funds in the Duke Endowment. By its provisions

Davison v. Duke University

the Doris Duke Trust will terminate as to two-thirds in value of its corpus (1) when neither Doris Duke nor any of her lineal descendants shall be living, or (2) 21 years after the death of the last surviving of certain relatives of James B. Duke, whichever shall occur first. Upon such termination, the Trustees shall distribute the two-thirds to the living lineal descendants of Doris Duke or, if there be no such lineal descendants, then to the Duke Endowment. Doris Duke, who was born on 22 November 1912, has no issue.

James B. Duke died testate on 12 October 1925, a resident of the State of New Jersey. His will was duly probated in Somerset County, New Jersey, and by Item 8 of this will he bequeathed $10 million to the Trustees of the Duke Endowment

"to be added to and become a part of the corpus of said trust estate and to be held, used, managed, administered and disposed of, as well as the incomes, revenues and profits arising therefrom and accruing thereto, by the trustees of said trust under and subject to all the terms of said trust indenture, except that: . . . and (b) all the incomes, revenues and profits arising and accruing from the said Ten Million Dollars shall be utilized, paid, applied and distributed each year by said trustees upon subject to and in accordance with all the terms of said Indenture with respect to the payment and distribution of a percentage of the incomes, revenues and profits of said trust to and for said Duke University."

After disposing of a portion of his residuary estate, Mr. Duke, by Item 11 of the will, bequeathed the remainder of his residuary estate to the Trustees of the Duke Endowment

"to be added to and become a part of the corpus of said trust and to be held, used, managed, administered and disposed of, as well as the incomes, revenues and profits arising therefrom and accruing thereto, by the trustees of said trust under and subject to all the terms of said trust indenture, except that all the incomes, revenues and profits arising from and accruing to said residue of said residuary estate shall be utilized, paid, applied and distributed each year by said trustees as to ninety per cent thereof upon, subject to and in accordance with all the terms of said indenture with respect to the payment and distribution of a percentage of the incomes, revenues and profits of said trust to

and for maintaining and securing hospitals, and as to the remaining ten per cent thereof upon, subject to and in accordance with all the terms of said indenture with respect to the payment and distribution of a percentage of the incomes, revenues and profits of said trust to and for said Duke University."

By Item 5 of his will he bequeathed to the Doris Duke Trust all shares of stock which he owned in Duke Power Company. Upon settlement of the Duke estate, the Doris Duke Trust held 127,904 shares of Duke Power Company common stock. As of 30 November 1971, the Duke Endowment held 43.15% of Duke Power Company common stock; the Doris Duke Trust held 6.69% of said common stock.

Plaintiff Trustees commenced this action against defendants (some of them individually and as representatives of classes similarly situated) seeking, *inter alia,* the following relief:

"3. That the court order the modification of the Indenture by striking the second paragraph of the 'FIFTH' division in its entirety and by striking out of the third through the eleventh paragraphs of the 'FIFTH' division the following words: 'not retained as aforesaid for addition to the corpus of this (the) trust.'

4. That the court order the modification of the Indenture by adding a new 'NINTH' division thereto as follows:

'NINTH.

The trustees shall distribute each year for any one or more of the charitable purposes expressed in this Indenture not less than the amount required to be distributed so as not to subject the trust to tax under section 4942 of the Internal Revenue Code of 1954, or corresponding provisions of any subsequent Federal tax laws; and the trustees shall not engage in any act of self-dealing as defined in section 4941(d) of the Internal Revenue Code of 1954, or corresponding provisions of any subsequent Federal tax laws; nor retain any excess business holdings as defined in section 4943(c) thereof, or corresponding provisions; nor make any investments in such manner as to incur tax liability under section 4944 thereof, or corresponding

provisions; nor make any taxable expenditures as defined in section 4945(d) thereof, or corresponding provisions.'

5. That the court order the modification of the Indenture by substituting a comma for the period at the end of the fifth paragraph of the 'THIRD' division and adding thereto the following:

> 'and to distribute the principal of this trust to the extent necessary in the judgment of the trustees to comply with the provisions of section 4942 of the Internal Revenue Code of 1954 or corresponding provisions of any subsequent federal statute.'

6. That the court enter an order in such form as may be deemed appropriate giving the Trustees the power and authority to invest and reinvest the assets of The Endowment in such securities and other properties as the Trustees in their discretion may select from time to time, subject to the conditions that (a) in making any investments not expressly permitted by the original Indenture the Trustees shall act with such care and judgment under the circumstances then prevailing which persons of ordinary prudence and reasonable discretion exercise in the management of their own affairs, considering the probable income as well as the probable safety of their capital, (b) the Trustees shall file with the clerk of this court in each year a statement in reasonable detail showing such investments made during the preceding calendar year, and (c) this court shall retain jurisdiction in this cause for the entry of such further orders relating to such investments as it may from time to time deem appropriate.

7. That the court construe the sixth paragraph of the 'THIRD' Division and the resolutions adopted by the Trustees pursuant thereto in the form shown on Exhibit B to authorize the Trustees in their discretion from time to time to distribute all or part of the assets held in each of the four separate endowment funds for the exclusive benefit of Duke University, Davidson College, Furman University and Johnson C. Smith University to the respective beneficiary of such account."

The action was heard before Judge Sam J. Ervin, III, without a jury. The question of jurisdiction of the trust estates, the Trustees, and the representatives of all classes of beneficiaries, was not controverted.

By stipulation, certain testimony taken in the case of *Cocke v. Duke University,* 260 N.C. 1, 131 S.E. 2d 909, was admitted into evidence. Under this stipulation testimony of Norman A. Cocke was introduced which tended to show his active participation in the preparation of the Duke Endowment Indenture. He testified that one of Mr. Duke's dominant motives was to build up economic conditions in certain parts of North Carolina and South Carolina. He did not think Mr. Duke contemplated the vast amount of money now required to finance Duke Power Company. In 1924 the prime source of electricity was water power, but today approximately 90% of all electricity is produced by steam.

Also admitted under the stipulation was the testimony of Phillip Heartt, Chairman of the Investment Committee of the Duke Endowment, John J. McCloy, an expert in investment problems of charitable foundations, Charles D. Dickey, an investment expert, and Dr. Raymond J. Saulnier, an expert in the field of economics.

The witness Heartt testified as to the increasing cost of operating hospitals and universities. He acknowledged that the performance of Duke Power Company stock had counterbalanced the erosion of fixed-income holdings in the Duke Endowment, but he stated that in his opinion Duke Power Company had reached maturity and would not continue to do so. He further noted the desirability of diversification in Endowment investments.

Mr. McCloy, in part, testified that the ideal situation in charitable trusts allowed the trustees great latitude in diversifying the trust portfolio.

Charles B. Dickey testified, in substance, that diversification of endowment holdings was desirable and that the Endowment's holdings in Duke Power Company common stock should not be increased.

Dr. Saulnier's testimony was concerned with the constant and growing inflationary trends. Particularly emphasized was

---

**Davison v. Duke University**

---

the extremely high cost of higher education and hospital care. He concluded that diversification was important and suggested that funds be invested so as to "protect them from the erosion of inflation . . . . "

An address by William R. Perkins, personal counsel for Mr. Duke, was admitted into evidence. Much of this address was devoted to an assessment of his client. The following excerpt exemplifies the high regard he had for Mr. Duke:

> "Nature endowed Mr. Duke most generously. A truly magnificent mind was supported by a splendid physique and graced with those finer qualities that mark the true gentleman. Common sense, rugged honesty, dynamic energy, tenacity of purpose and courage of conviction were his in abundance. He was most considerate of others, their rights, opinions and pleasures, which made him always a charming host and temperate in his views and expressions. I never heard him use an oath and he rarely spoke disparagingly of anyone."

In relating his experiences in drafting the Duke Endowment Indenture, Mr. Perkins characterized the trust as "one of the outstanding philanthropies of all time." He discussed Mr. Duke's purposes and motives in establishing the Duke Endowment and stated that the document giving it life took over ten years to prepare.

Plaintiffs' witness Edward P. Lebans testified at the January 1972 trial. Mr. Lebans is Vice-President and Director of First Boston Corporation, an investment banking firm dealing in the underwriting of securities for many large corporations, including Duke Power Company. This witness described the present magnitude of Duke Power Company's financial requirements. He referred to the Company's most recent prospectus, dated 7 December 1971, which indicated that Duke's construction program for the period 1971-1973 would amount to $1.182 billion, and that the Power Company would have to obtain about $300 million a year. He was of the opinion that the Duke Endowment could not handle the financial requirements of the Duke Power Company because of the Power Company's tremendous growth and resulting financial needs. He stated that if his company were to handle a securities offering for Duke

Power Company, the Duke Endowment would be treated in the same manner as any other institutional investor.

Carl Horn, President of Duke Power Company and found by the court to be an expert in corporate utility financing, testified that Duke Power Company spent about $380 million in 1971 and expected to spend approximately $400 million in 1972-1973. Three-fourths of this amount must come from outside financing, as the Duke Endowment has been unable to meet the financial requirements of the Duke Power Company for the past six or eight years because of the Company's increase in size. He stated that 33,500 shareholders held 30,000,000 shares of the Duke Power Company's stock. As of 1970 the Duke Endowment report indicated that it owned 13,035,100 shares of the stock.

Charles W. Shaeffer, President and Chairman of the Board of T. Rowe Price and Associates, Inc., was found to be an expert in the field of investment counseling, particularly as to foundations and educational institutions. He recommended that private foundations invest 60 to 80 percent of their holdings in equities or stocks and the balance in fixed-income securities.

The respective presidents of Duke University, Davidson College, Furman University and Johnson C. Smith University testified as to each of their university's financial condition and as to the past and present contributions to the universities by the Duke Endowment.

Mr. John F. Day, Treasurer of the Duke Endowment and the person who generally supervises the Duke Endowment records, testified that the Endowment did not employ a professional investment adviser but relied on members of its Board who were in contact with banking firms, investment managers and other investment experts to aid in the making of decisions for the Endowment. He stated that the Endowment maintains a regular review committee from its membership which meets bi-monthly, and that Mr. Frederick W. Bowman, the Endowment's Investment Officer, provides a daily review of Endowment investments. The total annual rate of return from the restricted investment (considering interest, dividends and capital returns) for the years 1960, 1965 and 1970, was as follows:

Davison v. Duke University

| Kind of Investment | 1960 | 1965 | 1970 |
|---|---|---|---|
| Duke Power Co. Voting Stock | 2.71 | 2.33 | 5.66 |
| Duke Power Co. Non-Voting Stock | 4.62 | — | — |
| Other Voting Stock | 2.23 | 2.21 | 4.92 |
| Other Non-Voting Stock | 4.90 | 4.66 | 7.32 |
| Duke Power Bonds | 2.72 | 3.32 | 5.84 |
| Other Bonds (including U.S.) | 3.63 | 3.51 | 5.10 |

The Endowment's net income after deducting expenses and the 20% annual accumulation for the years as below stated was: 1925: $310,865.66; 1960: $10,628,446.25; and 1970: $19,071,676.67 after a set aside of $968,922.80 for Federal Excise Tax.

Plaintiffs introduced many exhibits and charts tending to show inflationary trends, particularly as such inflation related to the high cost of higher education and hospital care.

Upon conclusion of plaintiffs' evidence, the Attorney General moved for dismissal of the action insofar as it pertained "to the investments to be made by the Duke Endowment." Defendant Guardian ad Litem Bailey Patrick, Jr., moved to dismiss as to "Paragraph 5 and 7 of the prayer for relief." Both motions were denied.

Defendant Mary Jane Walton offered into evidence a Duke Endowment record entitled "Transfers from Reserve Fund to Additions to Corpus Account."

Defendant Attorney General introduced certain interrogatories which tended to show that the Trustees of the Duke Endowment had not discussed alternative investments for the restricted funds at meetings during 1970-1971, nor had they at such meetings considered the possibility of investments in North Carolina industries and South Carolina industries in the event that it became necessary for the Endowment to divest itself of Duke Power Company stock. Among other alternatives, the Attorney General suggested investment in Small Business Association loans.

Upon completion of defendants' evidence, the Attorney General and Bailey Patrick, Jr., Guardian ad Litem, renewed their motions of dismissal, which motions were again denied.

The judgment, in effect:

1. Denied the Trustees' request to modify the Fifth division of the Indenture so as to delete the 20% mandatory accumulation provision.

Plaintiff Trustees appealed, but expressly conceded in their brief there was no error in this ruling.

2. Allowed plaintiffs' prayer that the Indenture be amended to comply with the provisions of the 1969 Tax Reform Act. This amendment permits the Trustees to annually distribute not less than the amount required to avoid taxation under Section 4942 of the Internal Revenue Code of 1954 or any corresponding provisions of any subsequent federal tax law. The modification further provided that the Trustees shall not engage in any act of self-dealing as defined in Section 4941(d) of the Internal Revenue Code of 1954 nor retain any "excess business holdings" as defined in Section 4943(c) thereof, nor make any investments so as to incur tax liability under Section 4944 thereof, nor make any taxable expenditures as defined in Section 4945(d) thereof, or corresponding provisions. There was no appeal from the granting of this relief.

3. Allowed plaintiffs' prayer that the Indenture be amended by adding to the 5th paragraph of the Third Division the following: "and to distribute the principal of this trust to the extent necessary in the judgment of the Trustees to comply with the provisions of Section 4942 of the Internal Revenue Code of 1954 or corresponding provisions of any subsequent federal statute." The Attorney General appealed. Defendant Mary Jane Walton appealed conditionally. She appealed only if the court should hold that the funds accumulated in the "additions to corpus" accounts may be distributed. All defendants appealed the order permitting the Trustees to decide the manner in which the funds were to be distributed.

4. Allowed plaintiffs' prayer that the Indenture be amended so as to broaden the investment powers of the Trustees. The Attorney General appealed to the granting of this relief.

5. Interpreted the 6th paragraph of the Third Division of the Indenture together with certain resolutions of the Trustees to allow the Trustees to distribute the "corpus" created by such resolutions to the beneficiaries therein named. The Attor-

Davison v. Duke University

ney General, Mary Jane Walton and Bailey Patrick, Jr., Guardian ad Litem appealed.

This Court allowed petition for writ of certiorari to the North Carolina Court of Appeals prior to determination on 24 May, 1972.

*Fleming, Robinson & Bradshaw, P.A. by Russell M. Robinson II, Attorneys for plaintiff-appellees.*

*Childs and Patrick, Attorneys for Bailey Patrick, Jr., Guardian ad Litem.*

*Helms, Mulliss & Johnston by E. Osborne Ayscue, Jr., Attorneys for the defendant-appellee The Trustees of Davidson College.*

*Young, Moore & Henderson by Charles H. Young, Attorneys for defendant-appellant Mary Jane Walton.*

*A. Kenneth Pye and Powe, Porter & Alphin by E. K. Powe, Attorneys for Duke University, defendant-appellee.*

*Robert Morgan, Attorney General, by Christine Y. Denson, Assistant Attorney General.*

BRANCH, Justice.

We first consider whether the trial court erred in broadening the investment powers of the Trustees of the Duke Endowment and in granting authority to the Trustees to distribute principal to the extent necessary to comply with the requirements of certain tax enactments.

Paragraph 4 of the Third Division of the Indenture restricts investment by the Trustees to investments in Duke Power Company, U. S. Government bonds and certain state and municipal bonds. Paragraph 4 provides:

"4. To invest any funds from time to time arising or accruing through the receipt and collection of incomes, revenues and profits, sale of properties, or otherwise, provided the said trustees may not lend the whole or any part of such funds except to said Duke Power Company, nor may said trustees invest the whole or any part of such funds in any property of any kind except in securities of said Duke Power Company, or of a subsidiary thereof, or in bonds validly issued by the United States of America,

or by a State thereof, or by a district, county, town or city which has a population in excess of fifty thousand people according to the then last Federal census, which is located in the United States of America, which has not since 1900 defaulted in the payment of any principal or interest upon or with respect to any of its obligations, and the bonded indebtedness of which does not exceed ten per cent of its assessed values. Provided further that whenever the said trustees shall desire to invest any such funds the same shall be either lent to said Duke Power Company or invested in the securities of said Duke Power Company or of a subsidiary thereof, if and to the extent that such a loan or such securities are available upon terms and conditions satisfactory to said trustees."

This "restricted" corpus is comprised of securities in Duke Power Company having a value of approximately $306,000,000. The remaining portion of the "restricted" corpus consists of $67,000,000 in fixed-income government and municipal bonds plus a relatively small amount of common stocks. There is an "unrestricted" corpus valued at approximately $9 million. We are here concerned only with the "restricted" corpus. It is noted that plaintiffs do not seek modification of the Indenture with respect to the Trustees' investment authority over Duke Power securities. The Trustees possess the power to sell such securities by unanimous vote.

This Court considered a similar question regarding the powers of investment of the Duke Endowment in the case of *Cocke v. Duke University,* 260 N.C. 1, 131 S.E. 2d 909. There the Court reversed the action of the trial judge in allowing modification. Rodman, J., speaking for the Court, concluded: "The evidence fails to establish facts necessary for an order authorizing the trustees to disregard the express provisions of the trust indenture. The court should have allowed the motion to nonsuit."

Certain pertinent propositions and principles of law were established in *Cocke v. Duke University, supra:*

First. The provision in the Indenture that the law of New Jersey was determinative of the appeal was adopted with the recognition that New Jersey law and North Carolina law governing modification of trust instruments are in substantial accord.

Second. A court may authorize a trustee to ignore the express provisions of the trust instrument limiting his authority with respect to the kind of securities in which he may invest. " 'But the power of the court should not be used to direct the trustee to depart from the express terms of the trust, except in cases of emergency or to preserve the trust estate.' *Penick v. Bank,* 218 N.C. 686, 12 S.E. 2d 253. 'It must be made to appear that some exigency, contingency, or emergency has arisen which makes the action of the court indispensable to the preservation of the trust and the protection of infants.' *Redwine v. Clodfelter,* 226 N.C. 366, 38 S.E. 2d 203."

New Jersey by statutory enactment recognizes the equitable power of the court, under certain circumstances, to modify the provisions of a trust instrument. N.J.S.A. 3A:15-15 (formerly 1937 R.S. 3:16-17, 18). This statute merely codified the earlier decisions of the New Jersey courts. *Morris Community Chest v. Wilentz,* 124 N.J. 580, 3 A 2d 808. See Annot., 170 A.L.R. 1219.

N.J.S.A. 3A:15-15 provides:

"Investment of trust funds; change in conditions; application to court

a. In all cases where by reason of a change in conditions which occurs, or *which may be reasonably foreseen,* the objects of any trust heretofore or hereafter created by will or other instrument, or by order of court, might be defeated in whole or in part by the investment or continuance of the investment of all the funds of such trust in the kinds of securities to which the trustee is or shall be limited by the statutes of this state or by the instrument or court order creating such trust, any trustee or beneficiary of such trust may institute an action in the superior court to secure authority permitting or directing the trustee or trustees of such trust to invest all or a part of the funds thereof in other kinds of investments.

b. If the court shall find that by reason of a change in conditions which occurs since the creation of such trust or *which may be reasonably foreseen,* the objects of the trust might be defeated in whole or in part by the investment, or continuance of the investment, of all the funds of such trust in the kinds of investments to which the trustee is then limited by the statutes of this state or by the instrument or court order creating such trust and that the objects

of the trust and the interests of all the beneficiaries thereof, whether vested or contingent, would be promoted by the investment of all, or some part, of the trust funds otherwise, the court shall by its order or judgment, notwithstanding that the trust so created may be in default in respect to the terms of the instrument creating such trust, authorize or direct the trustee of such trust to invest the whole, or such part thereof as it shall designate, in any class of investments, including common or preferred stocks of corporations of this state or of any other state or country, which in its judgment will promote the objects of the trust and the interests of all the beneficiaries thereof. However the court shall not authorize or direct the purchase of any class of common or preferred stock of any corporation unless the corporation shall have been organized and engaged in the conduct of its business for 5 calendar years immediately preceding the purchase of the stock of the corporation.

c. As used in this section 'trust' shall include 'guardianship', 'trustee' shall include 'guardian', and 'beneficiary' shall include 'ward'." (Our emphasis)

Third. " ' . . . [T]he condition or emergency asserted must be one not contemplated by the testator, and which, had it been anticipated, would undoubtedly have been provided for; and in affording relief against such exigency or emergency, the court must, as far as possible, place itself in the position of the testator and do with the trust estate what the testator would have done had he anticipated the emergency.' *Cutter v. Trust Co.,* 213 N.C. 686, 197 S.E. 542." We note that substantially the same language was used by the New Jersey Court in *Pennington v. Metropolitan Museum of Art,* 65 N.J. Eq. 11, 55 A. 468, to wit: " . . . in an emergency which had not been considered by the creator of the trust, and which, if anticipated, would have been provided for, a court of equity might take the place of the creator of the trust, and do what he would have done."

[1] There is an abundance of authority in both North Carolina and New Jersey to the effect that the courts will modify a trust instrument to preserve the purpose of the trust or protect its beneficiaries when some exigency or emergency not anticipated by the trustor will defeat his intent. *Lambertville Nat.*

Davison v. Duke University

*Bank v. Bumster,* 141 N.J. Eq. 396, 57 A. 2d 525; *Morris Community Chest v. Wilentz, supra; Wachovia Bank & Trust Co. v. Morgan,* 279 N.C. 265, 182 S.E. 2d 356; *Wachovia Bank & Trust Co. v. John Thomason Const. Co.,* 275 N.C. 399, 168 S.E. 2d 358; *Wachovia Bank & Trust Co. v. Johnston,* 269 N.C. 701, 153 S.E. 2d 449; *In re Trusteeship of Kenan,* 261 N.C. 1, 134 S.E. 2d 85, later appeal 262 N.C. 627, 138 S.E. 2d 547.

Fourth. Finally, *Cocke v. Duke University, supra,* stands for the proposition that in order to displace or circumvent an express provision in the trust instrument, one must do more than show a change of economic conditions. See also, *Reiner v. Fidelity Union Trust Co.,* 126 N.J. Eq. 78, 8 A. 2d 175; Annot., 170 A.L.R. 1219.

The "restricted" corpus is made up of three funds. The first, or "original" corpus, was the fund used to create the Duke Endowment. The "original" corpus in its inception had a value of $40 million and was intended to be the nucleus of the Endowment. The remaining two funds are derived from the will and a codicil to the will which was subsequently executed by Mr. Duke. As of 30 November 1971, these three corpus funds accounted for 13,035,100 shares of Duke Power Company. This represented 43.15% of the outstanding shares of Duke Power Company on that date. This percentage is of particular significance when considered in light of the provisions of Internal Revenue Code § 4943 of the Tax Reform Act of 1969 (26 U.S.C.A. § 4943). We should here make it clear that we shall not attempt to consider all the effects and ramifications of this section of the Internal Revenue Code, but expressly limit our consideration to its effect and impact on the Duke Endowment.

Sections 4940, *et seq.,* of this Act impose certain requirements and place certain restrictions on private foundations, including the Duke Endowment. Perhaps the most restrictive and unique section is Sec. 4943, which penalizes by way of taxation "excess business holdings." As defined in Sec. 4943 (c) (1), the phrase "excess business holdings" means that "amount of stock or other interests in the enterprise which the foundation would have to dispose of to a person other than a disqualified person in order for the remaining holdings of the foundation in such enterprise to be permitted holdings."

An initial tax of 5% of the value of the "excess business holdings" is levied if a foundation violates the provisions of

Sec. 4943, and an additional tax of 200.% of the value of the excess holdings retained ninety days after being notified of its violation may be imposed on the foundation.

Sec. 4946(a) defines "disqualified person" as, including among others, a member of the family whose ancestor was a substantial contributor to the foundation. The Doris Duke Trust, established by James B. Duke for his daughter, is clearly a "disqualified person" under the statutory definition. It presently holds 2,020,052 shares of the Duke Power Company common stock. According to the record, there are other disqualified persons holding 1,421,057 shares of Duke Power stock. On 30 November 1971 all disqualified persons, including the Doris Duke Trust, owned 11.39% of the outstanding stock in Duke Power Company.

Sec. 4943(c)(5) of the Tax Reform Act of 1969 allows a 10-year period of grace after distribution to the foundation under a trust or will in which the trust must divest itself of the excess business holdings or suffer the severe tax penalties. Sec. 4943(c)(6) sets a 5-year period to dispose of such holdings after receipt by the foundation of gifts or bequests.

Sec. 4943 sets up an intricate network of standards and criteria. Its application depends upon the facts and circumstances existing at a given point in time. The extent of stock divestiture, if required, will be governed by such factors as the percentage of stock owned by disqualified persons and the Endowment, dilution of issued and outstanding shares, and possible changes or interpretations in the controlling tax law.

As argued by the Trustees and concluded by the trial judge, the Tax Reform Act may: (1) prevent the Duke Endowment from purchasing any more Duke Power stock; (2) limit the Endowment's ownership in Duke Power Company to 25% after 26 May 1979; and (3) require the Endowment to dispose of stock in Duke Power Company that it might receive from the Doris Duke Trust.

The enactment of Sec. 4943, at the very least, will require the Trustees to constantly review the percentage ownership of the Company as represented by their holdings, whether attributable to present holdings, additions thereto from existing trusts or agreements, or to future transfers by gifts. This review may result in the decision by the Trustees, based upon the facts as they then exist, to dispose of a large number of

Davison v. Duke University

shares because of the application of and sanctions imposed by
Sec. 4943. Thus, it becomes readily apparent that the provisions
of the 1969 Tax Reform Act will have a tremendous and far-
reaching effect on the Duke Endowment.

The Trustees stressfully argue that divestment of the
Duke stock will compel them to invest in fixed-yield, low income
government bonds and securities, thereby seriously impairing
the Endowment's capacity to meet the spiraling costs of its
beneficiaries' needs.

To illustrate the rising costs and needs of those benefited
by the Duke Endowment, plaintiffs introduced into evidence
various charts and exhibits. It was shown, for example, that
the average cost per inpatient per day in assorted hospitals
increased from $20.04 in 1960 to $55.52 in 1970—an increase of
177.05% at a compound rate of approximately 11% per year.
The cost of hospital construction on a per-bed average rose from
$11,245 in 1950 to $19,072 in 1960 and $35,035 in 1970. The
average cost per student at the four universities assisted by
the Endowment climbed from $2,024 in the academic year
1960-61 to $4,294 in 1970-71. Plaintiffs estimate this 112.15%
increase to represent a compound rate of almost 8% per year.
Similar cost and need increases, they maintain, have afflicted
the other charitable beneficiaries.

It is of interest to note that of the twenty-six foundations
having assets greater than $100 million reported by Waldemar
A. Nielsen in his recently published book, *The Big Foundations*,
the Duke Endowment had, by far, the worst cumulative invest-
ment performance for the years 1967, 1968 and 1969. While
Standard and Poor's Index showed a rate of return gain of
26.94% for the three years, the Duke Endowment suffered a
cumulative performance rate of return loss of −15.65%. By
the end of 1969 the Endowment had fallen in rank from the
third largest foundation to the fifth largest behind Ford, Lilly,
Rockefeller and Pew. See, W. Nielsen, *The Big Foundations*,
(1972).

Plaintiffs further contend that their problems will be
compounded and one of the stated desires of the trustor—to
provide a safe and enduring investment—will be thwarted by
the provisions of Sec. 4942 of the Tax Reform Act of 1969
unless their investment powers are broadened. This section, in
substance, provides that a private foundation must distribute

currently all its net income other than long-term capital gains. To prevent avoidance of the requirement for distribution of income by investment in growth stocks or nonproductive land, a private foundation is required to pay out at least a specified percentage of its non-charitable assets. The minimum pay-out as applied to the Duke Endowment is presently 4½%, and is projected to reach 6% by 1 January 1975. The Secretary of the Treasury is authorized to adjust this rate from time to time. Noncompliance with these provisions would result in an initial tax of 15% of the amount of income remaining currently undistributed, and noncompliance at the close of an allowed correction period would result in a 100% tax levy on the amount remaining undistributed at that time.

The Indenture gave the Trustees no authority to invade the corpus; however, one of the portions of Judge Ervin's judgment did give the Trustees authority to comply with this and other portions of the Tax Reform Act. Even so, it is evident that every party to this action would prefer that the corpus of the trust remain intact, free from encroachment by this tax statute. Plaintiff Trustees assert that under their existing investment powers they cannot meet the requirements of Sec. 4942 and prevent erosion of the Endowment's corpus fund.

We quote a portion of Judge Ervin's Findings of Fact, Conclusions of Law, and relief granted:

### FINDINGS OF FACT

"30. In 1924, there was no precedent in the history of this country for the long-term inflation that has occurred since about 1940; and in 1924 James B. Duke did not foresee, and could not reasonably have foreseen, the persistent, long-term inflation that has developed as a result of several factors that have become operative in the economy since 1924.

32. The beneficiaries of the Endowment are dependent upon the Endowment for the payment of expenses, and the importance to these beneficiaries of the support furnished by the Endowment will increase in the future.

37. The income from the Endowment's non-Duke portfolio will not increase as the needs and expenses of its beneficiaries increase to the extent that such portfolio is invested in fixed-income securities.

Davison v. Duke University

38. A change in conditions has occurred since the creation of the Endowment, and further changes may be reasonably foreseen, by reason of which the objects of the Endowment might be defeated in whole or in part by the investment or continuance of the investment of the funds of the non-Duke portfolio of the Endowment in the kinds of securities (that is, certain designated government bonds) to which the trustees are now limited by the fourth paragraph of the Third division of the Indenture; and the objects of the Endowment and the interest of all the beneficiaries thereof, whether vested or contingent, would be promoted by the investment of all, or some part, of the funds of the non-Duke portfolio of the Endowment in other securities.

39. The changes in conditions since the creation of the Endowment, and the probable future changes, have created an emergency which had not been considered by James B. Duke, the creator of the Endowment, and which, if anticipated, would have been provided for.

40. Some of the changes which have occurred since the creation of the Endowment in 1924, and which James B. Duke did not foresee and could not reasonably have foreseen, are:

(a) the enactment of the Tax Reform Act of 1969 which, among other things, (i) prevents the Endowment from buying any more stock of Duke Power Company, (ii) requires the Endowment to reduce its percentage of ownership in the outstanding common stock of Duke Power Company from the present 43.15% to not more than 25% by May 29, 1979, and (iii) will require the Endowment to dispose of any stock of Duke Power Company that it may acquire from The Doris Duke Trust, as a result of all of which the Endowment cannot hereafter expect to control Duke Power Company indefinitely in the manner contemplated by James B. Duke;

(b) the advent since about 1940 of an inflationary economy wherein prices have risen and will continue to rise over a long period of time at an annual rate of about 3% to 5% per annum, and wherein most people

expect such inflation and take it into consideration in their business and investment planning;

(c) changes in investment philosophy and policies whereunder it is no longer considered prudent and safe to invest all or most of a portfolio of trust investments in government bonds and whereunder, because of the erosion of inflation and because of better government regulation, it is now considered prudent and necessary to invest in a diversified portfolio of common stocks as well as fixed-income securities, with greater emphasis at the present time on common stocks;

(d) the accelerating rate and increasing scope of changes in economic and social conditions, which make it necessary for trustees of a charitable trust to have a wider range of choices and a greater flexibility in selecting and disposing of investments;

(e) the shift from conventional hydroelectric energy to steam generated energy, as demonstrated by the fact that the ratio was approximately 96% steam and 4% water power in 1970 compared with 10% steam and 90% water power in 1929, and the advent of nuclear energy, as a result of all of which Duke Power Company is and will increasingly be primarily dependent upon natural resources obtained from areas outside of North Carolina and South Carolina, instead of water power within these States, for the generation of electricity; and

(f) the growth of the financial needs of Duke Power Company so far beyond the ability of the Endowment to supply the same that it now makes no appreciable difference to Duke Power Company whether or not the Endowment buys its securities.

41. If James B. Duke had anticipated the present conditions when he created the Endowment in 1924, he would have provided that the trustees of the Endowment may now and hereafter, to the extent that any funds of the Endowment are not loaned to or invested in the securities of Duke Power Company or its subsidiaries, invest and reinvest those funds in such securities and other properties as the trustees in their discretion may select from time to

time, subject to currently appropriate limitations on the investment authority of fiduciaries."

## CONCLUSIONS OF LAW

"13. The Tax Reform Act, among other provisions, (a) prevents the Endowment from buying any more shares of any class of stock, whether voting or nonvoting and whether common or preferred, of Duke Power Company, (b) requires the percentage of the total outstanding shares of common stock of Duke Power Company owned by the Endowment to be reduced to not more than 25% by May 26, 1979, and (c) would require the Endowment to dispose of stock of Duke Power Company that it might receive from The Doris Duke Trust.

14. The facts in this case are sufficient to justify the Court granting the relief requested in paragraph 6 of the prayer for relief in the Complaint, as amended."

. . . .

"NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DE-CREED:

. . . .

"4. The Indenture of The Duke Endowment is hereby modified by adding the following sentence to the end of the fourth paragraph of the Third division:

'Provided further that the trustees may, to the extent that any funds of this trust are not loaned to or invested in the securities of Duke Power Company or its subsidiaries, invest and reinvest those funds in such securities and other properties as the trustees in their discretion may select from time to time, subject to the condition that in making any investments not expressly permitted by this Indenture the trustees shall act with such care and judgment under the circumstances then prevailing which persons of ordinary prudence and reasonable discretion exercise in the management of their own affairs considering the probable income as well as the probable safety of their capital.' "

We do not deem it necessary to recount the vast array of facts, figures and testimony offered by plaintiffs indicating the charitable beneficiaries' burgeoning needs and skyrocketing

costs. The Endowment's ability in the past to successfully cope with these problems has been amply demonstrated. There is no question but that many persons and institutions have been incalculably benefited by the Duke Endowment. This, ostensibly, is the reason the Endowment was created. To diminish the foundation's effectiveness in rendering aid and support to its beneficiaries would likewise add to the destruction of its primary purpose and importance. We believe that the inevitable effects of inflation and taxation on this trust property, which without modification will be increasingly committed to low, fixed-yield securities, will greatly impair the Duke Endowment's ability to perform in the role directed by James B. Duke.

[2]  Accordingly, we are of the opinion that there was ample evidence to support Judge Ervin's Findings of Fact above quoted. Thus, it appears that unanticipated changes of circumstance, both existing and reasonably foreseeable, have created an emergency which threatens to defeat, in whole or in part, the purposes and objects of the Duke Endowment.

Upon such showing, the court must determine the intent of the settlor in order to fashion the proper remedy. *Lambert-ville Nat. Bank v. Bumster, supra; Pennington v. Metropolitan Museum of Art, supra; Morris Community Chest v. Wilentz, supra; In Re Trusteeship of Kenan, supra.* More simply stated, we must here seek to determine what Mr. Duke would do if he were living. In search of this answer we first look to his dominant purpose in creating the Duke Endowment. The trial judge's Finding of Fact No. 28 that "The principal purpose of the Endowment as intended by Mr. Duke and as it exists today, is to serve the needs and pay the expenses of its charitable beneficiaries by distributing funds to or for the benefit of those beneficiaries," is supported by the record evidence. We note in passing that W. M. Perkins, Mr. Duke's attorney and confidant, who spent many months with the settlor in the preparation of the Trust Indenture and his will, characterized the Duke Endowment in these words: "To uplift mankind! To promote human happiness! Such is the true philosophy and the sublime of life. Such, in its essence, is The Duke Endowment I have endeavored to portray to you."

A perusal of the pertinent documents and the record evidence discloses other satellite purposes, including control of Duke Power Company through the Duke Endowment, the development of areas of North and South Carolina through water

power for investment, and the use of Duke Power Company as the Endowment's prime investment source.

We think it necessary to consider some of James B. Duke's personal characteristics and attributes. His financial genius guided the American Tobacco Company to its place as one of the giants of American industry. He was the guiding hand in the creation and building of the great Duke Power Company. He has been characterized as being astute and adaptable to the changing needs of his time. The record relates an instance of these characteristics. In 1925 Duke Power Company was unable to supply all the demands upon it because of a severe drought. Immediately thereafter, Mr. Duke directed that a steam plant be constructed so as to prevent recurrence of such disability. The Charlotte Observer reported this prompt action as being "typical" of Mr. Duke's ability to cope with unprecedented situations.

We again refer to that portion of *Cocke v. Duke University,* *supra,* to the effect that modification of a trust instrument requires more than a change of economic conditions. We have some doubt as to the efficacy of that statement where it is shown that the ravages of inflation and other economic pressures threaten to destroy the dominant purposes of a trust. See, generally, *Carlick v. Keiler,* 375 S.W. 2d 397 (Ky. App. 1964) ; *In Re Trusteeship under Agreement with Mayo,* 259 Minn. 91, 105 N.W. 2d 900; *Troost Avenue Cemetery Co. v. First National Bank,* 409 S.W. 2d 632 (Mo. 1966) ; II Scott on Trusts, § 167 (3rd Ed. 1967) ; Bogert, Trusts and Trustees, § 561 (2nd Ed. 1965).

The *Cocke* decision, however, recognized the unfettered right of the Trustees to invest in the stock of Duke Power Company, the "prime investment" which for many years has counterbalanced inflationary trends. The Tax Reform Act of 1969 may not only preclude such investment but may well mandate divestment of a large portion of the Duke Power stock held by the Endowment. Under the existing Indenture investment provisions, the Trustees are relegated to investments in relatively low, fixed-yield securities in filling the void caused by forced divestiture of the Duke stock. Such an alternative can hardly combat the forces of inflation and at the same time satisfy the increasing needs of the Endowment's charitable beneficiaries.

We are convinced that this perceptive and shrewd businessman, were he alive today, would direct the Trustees of the Duke

Endowment to take immediate action to prevent erosion of the corpus of the trust in order to preserve the dominant purposes of the Duke Endowment: to serve the needs and pay the expenses of its charitable beneficiaries. The voluminous evidence offered by plaintiffs leads us to believe Mr. Duke would have accomplished this purpose by broadening his Trustees' powers of investment and authorizing his Trustees to distribute principal only to the extent necessary to comply with Sec. 4942 of the 1969 Tax Reform Act or corresponding provisions of any subsequent federal statute.

[2]   The trial judge's Findings of Fact were supported by competent evidence, and the Findings in turn support the Conclusions of Law. We find no error of law in the trial judge's entry of judgment broadening the Trustees' powers of investment and authorizing principal distribution. In accordance with Mr. Duke's wishes the Trustees should give all possible preference, consistent with good investment practices, to investments furthering the social and economic welfare of the areas served by Duke Power Company.

We next consider whether the Trustees of the Duke Endowment may distribute funds "added to corpus" pursuant to certain resolutions. Plaintiffs requested the trial court to construe the 6th paragraph of the Third Division and the resolutions adopted by the Trustees pursuant thereto to permit distribution of all or part of these funds.

The income from the "original" corpus, one of the three principal funds constituting the Duke Endowment, is payable in specified percentages to certain beneficiaries set forth in the Fifth Division of the Indenture. The 2nd paragraph of this Division directs the Trustees to retain 20% of the net income before distribution until the total aggregate of such additions equals $40 million. 32% of the income remaining must be paid to Duke University, barring certain contingencies, as mandated by the 3rd paragraph of the Fifth Division.

Mr. Duke's will, executed on the same day as the Indenture, poured other assets into the trust. Item 8 of the will bestowed $10 million unto the Endowment, providing that the income accruing thereto be paid to Duke University. Item 11 as rewritten by codicil permitted the Trustees to expend $7 million of the residue of testator's residuary estate for Duke University's benefit and directed that 90% of the income, revenues and profits

derived therefrom be distributed to hospitals. The remaining 10% was to be paid to Duke University.

The Third Division of the Indenture lists the powers conferred upon and the restrictions imposed upon the Trustees in the management and administration of these assets. Because of its critical importance to decision of this issue, we set out paragraph 6 of the Third Division in full:

> "6. As respects any year or years and any purpose or purposes for which this trust is created (except the payments hereinafter directed to be made to Duke University) the trustees in their uncontrolled discretion may withhold the whole or any part of said incomes, revenues and profits which would otherwise be distributed under the 'FIFTH' division hereof, and either (1) accumulate the whole or any part of the amounts so withheld for expenditures (which the trustees are hereby authorized to make thereof) for the same purpose in any future year or years, or (2) add the whole or any part of the amounts so withheld to the corpus of the trust, or (3) pay, apply and distribute the whole or any part of said amounts to and for the benefit of any one or more of the other purposes of this trust, or (4) pay, apply and distribute the whole or any part of said amounts to or for the benefit of any such like charitable, religious or educational purpose within the State of North Carolina and/or the State of South Carolina, and/or any such like charitable hospital purpose which shall be selected therefor by the affirmative vote of three-fourths of the then trustees at any meeting of the trustees called for the purpose, complete authority and discretion in and for such selection and utilization being hereby given the trustees in the premises."

Acting pursuant to the above quoted provisions, the Trustees withheld and invested incomes, revenues and profits otherwise distributable. During the years 1934 to 1959 a series of resolutions were adopted by the Trustees. These resolutions, hereinafter referred to as "corpus" resolutions, were in the following form:

> "WHEREAS, acting under said power the said Trustees have withheld and invested incomes, revenues and profits therefrom which would otherwise have been distributed under the FIFTH division of said Indenture, and now acting

further under said powers they wish to make payments, applications and distributions out of said withholdings as herein stated; on motion of _____ _____ _____ seconded by _____ , it was unanimously

RESOLVED that the following securities and cash out of said investment of said withholdings, namely:

[Here the assets transferred are named]

be and the same are hereby added to the Corpus of the trust established by said Indenture, said additions and all the incomes, revenues and profits therefrom, and all additions and accretions thereto to be held, used, invested and administered by the Trustees of said trust and their Successor Trustees under and in accordance with all the terms of said Indenture, except that the incomes, revenues and profits accruing to and arising from said additions to said corpus shall be paid, applied and distributed to the . . . . . . University mentioned and described in Division FIFTH of said Indenture for the purposes stated and subject to the powers of withholding given in said Division FIFTH as respects said University."

Each resolution provided that income from the securities therein named be paid and applied for the benefit of either Duke University, Furman University, Johnson C. Smith University or Davidson College. As of 30 November 1971, the aggregate market value of the assets in the four accounts was $44,636,160. Of this amount $40,101,079 were earmarked for Duke University, $1,824,196 for Furman University, $889,511 for Johnson C. Smith University, and $1,821,374 for Davidson College.

None of the named universities have ever had funds withheld from them pursuant to paragraph 6 of the Third Division of the Indenture. The funds were principally made up of funds withheld from hospitals. These withheld funds were channeled into four accounts, each of which being captioned "Additions to Corpus—_____ University."

[3]  One of the basic tenets of trust law is that the principal or corpus constituting the subject matter of a trust cannot be distributed prior to termination in the absence of express or implied authority in the trust instrument. *Bank v. Broyhill,* 263 N.C. 189, 139 S.E. 2d 214; *Woody v. Christian,* 205 N.C. 610, 172 S.E. 210; Bogert, Trusts and Trustees, § 812 (2nd Ed.

1962). See generally, Annot., 1 A.L.R. 2d 1328. There are two exceptions to this rule. First, as pointed out earlier, a court may permit modification of the instrument when essential to protect the trust and its beneficiaries from an unforeseen exigency threatening to destroy the settlor's intent and purposes in creating the trust. *Hardy v. Bankers Trust Co.,* 137 N.J. Eq. 352, 44 A. 2d 839; *Fidelity Union Trust Co. v. J. R. Shanley Estate Co.,* 113 N.J. Eq. 562, 167 A. 865; *Shannonhouse v. Wolfe,* 191 N.C. 769, 133 S.E. 93; II Scott on Trusts, § 167 (3rd Ed. 1967). Second, a court may order invasion of the corpus for the necessary support of a beneficiary when the interest of another beneficiary is not thereby impaired. *Hughes v. Federal Trust Co.,* 119 N.J. Eq. 502, 183 A. 299; *Gluckman v. Roberson,* 115 N.J. Eq. 522, 171 A. 674, aff'd 116 N.J. Eq. 531, 174 A. 488; II Scott on Trusts, § 168 (3rd Ed. 1967); Restatement of Trusts 2d § 168 (1959).

Plaintiffs do not dispute this general rule or claim to be within either of the exceptions. Nor do they argue that the withheld funds were not "added to corpus" pursuant to the second option in the 6th paragraph of the Third Division by their resolutions. It is their contention that the funds in question were placed in a distributable-type corpus, a category entirely different from the permanent corpus established by the Indenture. Plaintiffs seek to demonstrate that Mr. Duke intended to and did give his Trustees such broad powers in the accumulation, use and distribution of the income from the corpus as would allow the Trustees to create a temporary, distributable corpus, and that their actions did, in fact, create such a corpus.

Examples of the language granting the broad powers are found in paragraph 6 of the Third Division, where the Trustees are granted (except as to payments to Duke University) "uncontrolled discretion to withhold the whole or any part of said incomes and profits which would otherwise be distributed under the Fifth Division hereof . . . , " and in paragraph 8 of the same Division which granted to the Trustees "any and all other powers which are necessary or desirable in order to manage and administer the trust and the properties and funds thereof, and carry out and perform in all respects the terms of this indenture according to the true intent thereof."

Defendants, on the other hand, strongly contend that once the withheld funds were added to the corpus of the trust estab-

lished by the Indenture they became a part of the permanent corpus. Nothing, they argue, appears in the language of the trust Indenture expressly or impliedly authorizing the creation of a temporary corpus or the power to invade corpus.

All parties to this action agree that the Indenture was drawn by a careful and skilled legal craftsman; plaintiffs therefore aver that all words used by the scrivener were used with care and with a purpose. They call attention to paragraph 2 of the Fifth Division and paragraph 3 of the Fifth Division where, in providing for additions to corpus, Mr. Duke used the phrase "for the purpose of increasing the principal of the trust estate." Plaintiffs note the absence of this descriptive phrase in the discretionary powers contained in the 6th paragraph of the Third Division and urge that the difference in the language employed permits a reasonable conclusion that Mr. Duke intended to sanction a distributable as well as a permanent corpus.

Conversely, defendants take the position that no reason existed for Mr. Duke to have anticipated a distributable-type corpus made up of withheld income, for the temporary housing of such funds could be accomplished by the Trustees pursuant to the provision of paragraph 6 authorizing the withholding of incomes, revenues and profits. Since the Trustees could "withhold . . . any part of said incomes . . ." they could invest the withheld funds in accordance with the power in the 4th paragraph of the Third Division enabling them "to invest any funds from time to time arising or accruing through the receipts and collections of incomes . . ." This is, in effect, the course of action taken by the Trustees in establishing a reserve fund made up of funds withheld from certain beneficiaries. The reserve fund constituted the source from which the "additions to corpus" were made.

Defendants place their greatest reliance on the argument that each of the options listed in the 6th paragraph is mutually exclusive. Once any one option is exercised, the involved funds cannot be used pursuant to one of the other options. Therefore, once withheld funds have been "added to corpus" by resolution adopting the second option, subsequent attempts to accumulate or distribute the same funds according to the first, third or fourth options would be inefficacious. This argument highlights the "either . . . or" proposition used to introduce and join the respective options.

Davison v. Duke University

Black's Law Dictionary defines "or" as "a disjunctive participle, used to express an alternative or to give a choice of one among two or more things."

Our Court, construing a statute in the case of *In Re Duckett*, 271 N.C. 430, 156 S.E. 2d 838, stated: "Further, the disjunctive participle 'or' is used to indicate a clear alternative. The second alternative is not part of the first, and its provisions cannot be read into the first." On the other hand, it is recognized that the word "or" may be interpreted as the word "and" when necessary to effect the apparent intent of the person executing the trust indenture or other paper writing. *Jones v. Waldroup*, 217 N.C. 178, 7 S.E. 2d 366; *Pilley v. Sullivan*, 182 N.C. 493, 109 S.E. 359; *Ham v. Ham*, 168 N.C. 486, 84 S.E. 840. These arguments, as related to particular words or phrases, are not in themselves convincing.

Both plaintiffs and defendants have endeavored to isolate words or phrases in the instrument to show the true intent of Mr. Duke. To place exaggerated stress on such words or phrases or their absence in another part of the writing could often thwart the will of the trustor.

[4] In determining the intent of a trustor the court is not limited to a determination of what is meant by a particular phrase or word. A trust indenture is but the expression of a settlor's intention reduced to writing, and it is often necessary to go to the "four corners" of the instrument in order to gather a full understanding of his intent. *Clark v. Judge*, 84 N.J. Super. 35, 200 A. 2d 801; *Morristown Trust Co. v. Thebaud*, 43 N.J. Super. 209, 128 A. 2d 288; *Woods v. Woods*, 105 N.J. Eq. 205, 147 A. 506; *Morris v. Morris*, 246 N.C. 314, 98 S.E. 2d 298; *Trust Co. v. Schneider*, 235 N.C. 446, 70 S.E. 2d 578; *Allen v. Cameron*, 181 N.C. 120, 106 S.E. 484; *St. James v. Bagley*, 138 N.C. 384, 50 S.E. 841; 54 Am. Jur. Trusts, § 17; 90 C.J.S. Trusts, § 162. That intent is determined by the language he chooses to convey his thoughts, the purposes he seeks to accomplish, and the situation of the other parties to or benefited by the trust. *Callaham v. Newsom*, 251 N.C. 146, 110 S.E. 2d 802.

In seeking decision of the question here presented we first consider whether the trust Indenture reveals an intent by the settlor authorizing the creation of a distributable corpus. At the outset we agree that Mr. Duke intended to grant to his Trustees

broad discretionary powers in withholding, accumulating and distributing income generated by the corpus of the trust; however, it must be borne in mind that the broad discretion as to the management of these funds is delimited by and delineated in the four alternatives appearing in paragraph 6 of the Third Division.

[5] The extent of the discretion lodged in trustees by settlors may be enlarged by the use of adjectives or phrases such as "absolute" or "uncontrolled." Even the use of such strong terms does not grant unlimited discretion. The real question is whether it appears that the trustees are exercising their discretionary powers in the manner in which the settlor contemplated they should act. Ordinarily, the extent of the discretion conferred upon trustees by a settlor depends upon the terms of the trust and the nature of the powers interpreted in light of all the circumstances known to the settlor when he executed the trust instrument. III Scott on Trusts, § 187 (3rd Ed. 1967).

Mr. Duke stated in the First Division of the Indenture that the Duke Endowment shall have "perpetual existence." His mandatory directions in paragraph 2 of the Fifth Division commanding the Trustees to retain 20% of the income from the principal of the Endowment for the purpose of increasing the principal of the trust estate to as much as $40 million exemplifies his desire that the corpus should be increased and kept inviolate so as to insure the perpetuity of the Endowment. By paragraph 2 of the Sixth Division it was provided that any stock dividend or rights declared upon stock held in trust should be treated and deemed to be principal, even though it should represent earnings. Mr. Duke again sought to protect the corpus of the trust when he provided in paragraph 2 of the Eighth Division against reverter to himself or his heirs or representatives. His request for "safe and enduring investment" in the Seventh Division further illustrates his proclivity for permanence.

Unquestionably, Mr. Duke intended that there be additions to the corpus of the trust. This is evidenced by his express reservation of the right to add to the corpus in paragraph 5 of the Sixth Division, and the fact that he did so add by his will. The power to add to corpus is also specifically recognized as being lodged in the Trustees by the controversial 6th paragraph of the Third Division.

Paragraph 5 of the Sixth Division provides:

"5. The party of the first part hereby expressly reserves the right to add to the corpus of the trust hereby established by way of last will and testament and/or otherwise, and in making such additions to stipulate and declare that such additions and the incomes, revenues and profits accruing from such additions shall be used and disposed of by the trustees for any of the foregoing and/or any other charitable purposes, with like effect as if said additions, as well as the terms concerning same and the incomes, revenues and profits thereof, had been originally incorporated herein. In the absence of any such stipulation or declaration each and every such addition shall constitute a part of the corpus of this trust for all the purposes of this Indenture."

By this paragraph Mr. Duke carefully reserved unto himself the right to make additions to the corpus and to declare that such additions as well as accruing income be used for the named trust and/or any other charitable purpose. He further provided that absent such declaration when the additions were made the additions would become a part of the corpus of the trust. This paragraph of the Indenture is significant in that only here was anyone given authority to deviate from the restrictions governing the corpus of the Endowment. It is pertinent that nowhere in the Indenture were the Trustees given the authority reserved by Mr. Duke to himself. Further, by this reservation he retained no powers to invade or alter the restrictions placed upon the corpus unless they were expressly declared when the additions were made. Undoubtedly, the last sentence in the above-quoted paragraph committed such additions to the permanent corpus of the trust.

The trust Indenture was meticulously prepared after many years of conference and consideration between the scrivener and Mr. Duke. It would not be unreasonable to presume that the granting of power to his Trustees to distribute additions to the corpus was considered and rejected by Mr. Duke and his attorney. Assuming, *arguendo,* that Mr. Duke intended to give his Trustees powers equal to those reserved to himself by paragraph 5 of the Sixth Division, it must be here noted that the Trustees made no declaration concerning the "additions to corpus" except as related to payment of income therefrom.

We have been unable to find decisions in any jurisdiction which interpret provisions indentical to those contained in paragraph 6 of the Third Division. The most analogous situation is found in those jurisdictions which recognize discretionary trusts; i.e., trusts which are not marked in fixed lines, but lodge in the trustee large discretionary powers, particularly in the payment of benefits. One of these cases is *In re Baeder's Estate*, 190 Pa. 614, 42 A. 1104. There the testator left his estate to trustees, giving each child an equal share, and as to each son providing:

> " . . . 'Fifth. I direct my trustees to pay to each of my sons as they respectively attain twenty-one years of age five thousand dollars; and on their attaining twenty-five years I empower my trustees to pay or transfer to them respectively such further sum or property as shall, together with the amount theretofore received by them from myself as an advancement or under this will, amount to the half of their share in my estate; . . . This power is to be exercised either in the whole or partially and from time to time as my trustees shall deem proper, looking to the habits, condition and circumstances of my said sons respectively. The residue of the share of my sons shall be retained by my trustees,' etc., in strict spendthrift trust. . . . "

The trustees declared as to one of the sons—Henry H. Baeder—that it was not in their judgment expedient to pay any further portion of his share. One of Henry's creditors attached the unpaid balance of a portion of one-half Henry's share. The court in holding that the attachment took nothing, stated:

> " . . . So long as their discretion was not exercised this part of the share remained under what may be called the second trust. If they exercised their discretion favorably and paid over any portion, clearly that passed out of their further control, and became part of the son's general estate. But if they decided adversely, that they would not pay, it seems equally clear that for the time being, at least, that portion was no longer under the second but passed into the final or spendthrift trust, and neither the son nor his creditors could obtain any grasp or hold upon it. This seems the logical and necessary result of the discretionary power lodged in the trustees by the testator."

Davison v. Duke University

Other authorities generally hold that the beneficiary of a "discretionary" trust cannot compel the trustee to pay or apply any trust benefit to him since the terms of such a trust permit the trustee to withhold payments at will. If, however, the trustee *elects* to exercise his discretion by deciding to pay the beneficiary, then the beneficiary can force the trustee to confer the benefit. Bogert, Trusts and Trustees, § 228 (2nd Ed. 1965); *Kiffner v. Kiffner*, 185 Iowa 1064, 171 N.W. 590; *Brown v. Lumbert*, 221 Mass. 419, 108 N.E. 1079; *Keyser v. Mitchell*, 67 Pa. 473. See, *Chambers v. Smith*, 3 App. Cas. 795 (1878). Cf. 71 L. Q. Rev. 464 (1955).

Defendants could well argue that since the Indenture provided for the accumulation, investment and temporary housing of funds without resort to corpus additions, the Trustees "elected" to add to the permanent corpus when they adopted the resolutions which expressly added withheld funds to corpus.

We here quote a portion of Judge Ervin's findings of fact and conclusions of law:

### FINDINGS OF FACT

"49. James B. Duke, as creator of the Endowment and signatory of the Indenture, and the original trustees as signatories of the Indenture, did not intend that the four numbered clauses of the sixth paragraph of the Third division of the Indenture would mutually exclude successive action under separate such clauses with respect to the same withheld amounts so that action under one such clause with respect to a particular withheld amount would forever thereafter prohibit action under another such clause with respect to the same withheld amount. Instead, James B. Duke and the original trustees intended that such four numbered clauses would be mutually exclusive only at any particular point of time because of the necessary fact that the trustees could not act under two or more such clauses simultaneously; and they intended that the trustees of the Endowment would have the power to act under one such clause with respect to a withheld amount at one time and then, to the extent possible, to act under another such clause with respect to that same withheld amount at a later time.

50. A construction of the Indenture and the aforesaid resolutions adopted by the trustees that would permit the

trustees to distribute at any time and from time to time all or any part of the amounts referred to in paragraph 46 above to the respective schools for whose benefit they are held would be in accord with the intent, purposes and desires of James B. Duke and the original trustees of the Endowment."

### CONCLUSION OF LAW

"16. The four numbered clauses of the sixth paragraph of the Third division of the Indenture do not mutually exclude successive action under separate such clauses with respect to the same withheld amounts so that action under one such clause with respect to a particular withheld amount would forever thereafter prohibit action under another such clause with respect to the same withheld amount. Instead, such four numbered clauses are mutually exclusive only at any particular point of time, and the trustees of the Endowment have the power to act under one such clause with respect to a withheld amount at one time and then, to the extent possible, to act under another such clause with respect to that same withheld amount at a later time."

[6] The trial court's findings of fact are conclusive on appeal when supported by any substantial evidence. However, the court's conclusions from the facts found involve legal questions which are subject to review on appeal. *Carolina Milk Products Association Co-op. v. Melville Dairy, Inc.*, 255 N.C. 1, 120 S.E. 2d 548. The interpretation of a contract, will or trust indenture involves the finding of intention. Such interpretation has always been recognized as being in the province of the court rather than the jury. Hence, it has uniformly been treated as a question of law subject to review by the appellate courts. *Prickett v. Royal Insurance Company Limited*, 56 Cal. 2d. 234, 14 Cal. Rptr. 675, 363 P. 2d 907, 86 A.L.R. 2d 711; *Borchers v. Taylor*, 83 N.H. 564, 145 A. 666, 63 A.L.R. 874; 5 Am. Jur. 2d, Appeal and Error § 823, § 829; 57 Am. Jur. Wills § 1028.

[7] If the trustor intended that exercise of one of the four options given the Trustees in paragraph 6 of the Third Division would exclude successive action under another, then there would be no implied authority to distribute funds added to corpus pursuant to the second option. We believe Mr. Duke did so intend.

**Davison v. Duke University**

Paragraph 6 fully and completely described the methods of accumulation and distribution and those eligible to be beneficiaries in the distribution of the withheld income. The language in that paragraph evidences and is consistent with the clarity and painstaking inclusiveness characterizing the entire Indenture. It encompassed the complete range and cycle of Trustee discretionary action as to withheld funds. At the time the Indenture was written there was but one corpus, the permanent corpus. Mr. Duke in clear, unambiguous language gave the Trustees the option to add funds to that corpus. We can find nothing in the "four corners" of the instrument indicating an intent to allow the Trustees to add to corpus and later distribute those additions. The specificity of the powers given his Trustees and the same specificity found in the restrictions placed upon them compel the conclusion that if Mr. Duke had intended to grant to his Trustees the power to distribute the corpus of the trust or additions thereto, he would have said so in the same clear and unambiguous language found throughout the trust instrument.

We conclude that so long as the funds are held under the "withholding provision" of paragraph 6 of the Third Division, they might have been distributed or transferred under any of the four options designated later in that paragraph. However, once the Trustees accumulated funds under option one, or distributed funds under options three or four, or added funds to the corpus under option two, the withheld funds could not be recalled and used for another purpose pursuant to another option. The very nature of options one, three and four warrant this result, for the exercise of one of these alternatives constitutes an election to pay over to or set aside for the benefit of the named beneficiary. So placed, the funds are taken out of the further control of the Trustees. See *In re Baeder's Estate, supra; Keyser v. Mitchell, supra.* For the reasons stated above and because of its position in the scheme of distribution and accumulation in the 6th paragraph, the same is true of the second option. In short the four options are, once exercised, mutually exclusive of each other.

We now consider the effect, if any, of the Trustees' actions as related to the additions to corpus funds.

In contract law, where the language presents a question of doubtful meaning and the parties to a contract have, practically

or otherwise, interpreted the contract, the courts will ordinarily adopt the construction the parties have given the contract *ante litem motam*. *Mayer v. Sulzberger*, 6 N.J. Super. 327, 71 A. 2d 233; *Barclay v. Charles Roome Parmele Co.*, 70 N.J. Eq. 218, 61 A. 715, affirmed, 71 N.J. Eq. 769, 71 A. 1133; *Preyer v. Parker*, 257 N.C. 440, 125 S.E. 2d 916; *Goodyear v. Goodyear*, 257 N.C. 374, 126 S.E. 2d 113; *Cole v. Fibre Co.*, 200 N.C. 484, 157 S.E. 857.

The interpretation of wills and trust instruments, by their very nature, require a different rule.

One line of authority states that since it is the intent of the trustor which must be given effect, the activities of the trustees not participated in or known by the trustor should not be given weight in construing the trust instrument. *Booge v. First Trust & Sav. Bank of Pasadena*, 64 Cal. App. 2d 532, 149 P. 2d 32; *Merchants Nat. Bank of Aurora v. Weinold*, 22 Ill. App. 2d 219, 160 N.E. 2d 174.

Other jurisdictions hold that when there is an ambiguity, the construction placed on the instrument by the trustees is entitled to some weight. *Eagan v. Comr. of Revenue*, 43 F. 2d 881 (5th Cir. 1930); *St. Louis Union Trust Co. v. Clarke*, 352 Mo. 518, 178 S.W. 2d 359. See Annot., 67 A.L.R. 1272; 90 C.J.S. Trusts § 165.

It appears North Carolina adopted the latter rule in the case of *Smith v. Creech*, 186 N.C. 187, 119 S.E. 3. There the Court considered the interpretation of wills and, in part, stated: "While not allowed as controlling, the acts of the parties in disposing of the property as owners shows their own concept of the meaning of these wills, and, in case of ambiguity, may be considered in aid of arriving at proper interpretation." New Jersey seems to follow a similar rule. *In re Leupp*, 108 N.J. Eq. 49, 153 A. 842; *Fink v. Harder*, 111 N.J. Eq. 439, 162 A. 614.

The weight of such evidence must be determined by the circumstances of each case. For instance, in the case before us some of the original Trustees assisted in the preparation of the trust instrument, and many of these Trustees were friends and confidants of the trustor. On the other hand, the relevant actions of the Trustees in this case lose probative force because they were unilateral and occurred at least nine years after the trustor's death.

Plaintiffs contend the actions of the Trustees in setting up separate bookkeeping entries for each beneficiary named in the various "corpus" resolutions is inconsistent with an intent to commit the funds to a permanent corpus. The strength of this argument is neutralized by the manifest need for segregated bookkeeping accounts to expedite the payment of income to the respective beneficiaries.

Plaintiffs further argue that the utilization of the word "used" in the "corpus" resolutions is inconsistent with the creation of a permanent corpus since that word is interchangeable with the word "distribute." Each resolution provides that the funds will be "used" and administered "in accordance with all the terms of the trust" except as to income arising therefrom. Here it must be noted that in transferring the assets forming the "original" corpus Mr. Duke stated that they were to be held in trust to be "used, managed, administered and disposed of." It is not, of course, argued that this phrase authorized invasion of corpus.

We think the most revealing of all the actions of the Trustees is shown by the language of the resolutions adding funds to the corpus established by the Indenture. Beginning in 1934 and continuing to and including 1959, these resolutions, after naming the assets to be transferred, clearly and unambiguously stated: "the same are hereby added to the corpus of the trust established by said Indenture, said additions and all the incomes, revenues and profits therefrom and all additions and accretions thereto to be held, used, invested and administered by the Trustees . . . in accordance with all the terms of said Indenture, . . . "

The original resolution and many of the succeeding resolutions were adopted by a Board of Trustees, most of whom were original Trustees and signatories of the trust instrument. A majority of the Trustees were extremely successful businessmen, as were their successor Trustees. Two of the members of the original Board of Trustees were the attorneys who conferred with and assisted Mr. Duke in the preparation of the Indenture and will. It seems beyond comprehension that these highly intelligent businessmen, outstanding lawyers, and their competent counsel would have adopted the language contained in the "corpus" resolutions as a vehicle to create a temporary or distributable corpus. Some of them must have been familiar with the long recognized principle of law forbidding invasion of

corpus without authority from the court or trustor. Nothing in this record discloses any attempt on the part of the Trustees to distribute any portion of the withheld funds during the thirty-five year period between enactment of the first resolution and the institution of this suit; this despite ample record evidence indicating the ever-increasing needs of the charitable beneficiaries.

Whatever weight we lend to the Trustees' actions as a practical interpretation of Mr. Duke's intent is consistent with our conclusion that exercise of one option prevents successive action under another with respect to the same withheld funds and, therefore, that Mr. Duke did not intend to authorize the Trustees to create a distributable corpus.

The situation, then, is this: The trustor provided that withheld funds may be added to corpus. The trustor did not provide that corpus or funds added to corpus may be distributed. The general rule of law is that corpus may not be invaded prior to termination absent express or implied authority in the instrument. Judicial modification is the exception. There is no express or implied authority in this Indenture to invade corpus. The Trustees added to corpus. Therefore, distribution of such funds could only be accomplished by modification of the trust instrument.

[8]  Section 4940 of the Tax Reform Act of 1969 provides for the levy of a 4% excise tax on "net investment income." Plaintiffs estimate this section would impose a tax on the funds accumulated by the "corpus" resolutions yielding an amount of approximately $115,000 annually. Plaintiffs do not argue and the record does not show that taxation in this amount would create such an exigency or emergency which might frustrate the intent and purposes of the trustor so as to permit judicial modification.

Our prolonged scrutiny of the trust instrument and the actions of the Trustees was in part motivated by the desire to minimize taxation of these charitable funds. Absent circumstances allowing modification, however, we agree with this statement in the case of In re Estate of Benson, 447 Pa. 62, 285 A. 2d 101:

"As to the obviation of taxes, it is incontestable that almost every settlor and testator desires to minimize his

tax burden to the greatest extent possible. However, courts cannot be placed in the position of estate planners, charged with the task of reinterpreting deeds of trust and testamentary dispositions so as to generate the most favorable possible tax consequences for the estate. Rather courts are obliged to construe the settlor's or testator's intent as evidenced by the language of the instrument itself, the overall scheme of distributions, and the surrounding circumstances."

We believe the language of the Duke Indenture, the overall scheme of distributions, and the surrounding circumstances lead to the inescapable conclusion that withheld funds theretofore added to corpus may not thereafter be distributed. Accordingly, the Trustees would not be exercising their discretionary powers in the manner contemplated by the settlor if they distributed such funds.

The trial judge erred in authorizing the Trustees in their discretion to distribute funds held in the four accounts for the benefit of Duke University, Furman University, Johnson C. Smith University and Davidson College.

[9] We have heretofore held that the trial judge correctly permitted the Trustees to distribute principal to the extent required by the Tax Reform Act. Further, our holding concerning the "addition to corpus" funds has mooted the appeal of Mary Jane Walton as to this issue. There remains, however, the question of whether the funds to be distributed in compliance with the various tax statutes are to be distributed according to a predetermined formula, rather than according to the Trustees' judgment.

In this connection the trial judge found:

"It is neither feasible nor desirable to require the trustees to make such distributions of principal to the same beneficiaries, for the same purposes and in the same percentages of distribution provided under the Fifth division of the Indenture, nor to require them to make any such distributions in accordance with any other predetermined formulae or directions, inasmuch as any such requirements would cause serious administrative problems, would be contrary to the purposes of the Endowment and the interests of its beneficiaries as a whole, might under the

circumstances be inequitable, and would not be in accord with the intent, purposes and desires of James B. Duke if he were here today or could have foreseen the present circumstances."

The record evidence supports the above findings of fact and the judgment entered thereon.

We do not deem it necessary to discuss the remaining assignments of error. Except as hereinabove stated, the judgment entered by the trial court is in all respects affirmed.

This cause is remanded to the Superior Court of Mecklenburg County for entry of judgment in accordance with this decision.

Modified and affirmed.

Chief Justice BOBBITT and Justice SHARP dissent in part and vote to affirm without modification.